MaddeN, Judge,
delivered the opinion of the court.
The Government made a contract to sell a war housing project containing 139 dwelling units which the Government had built in Knox, Indiana, to the plaintiffs. It did not convey the property to them until some seven months after the date when, the plaintiffs assert, it should have conveyed it. The plaintiffs sue for the damages which, they allege, resulted to them from the delay in making the conveyance.
The Government built the project in 1943 at a cost of $426,000. In 1946 it was determined to be surplus and subject to sale under Sections 301 and 304 of the Lanham Act, 42 U. S. C. 1541 and 1544. It was appraised at $215,-717 and in January 1947, was offered at that price on deferred payment terms to a group of tenant occupants to which group the Lanham Act gave a priority to purchase. The group offered $100,000 on terms. That offer was refused.
On February 25, 1947, the Commissioner of the Public Housing Authority, hereinafter called PHA, was advised by the Chairman of the Committee on Banking and Currency and the Chairman of the Subcommittee on Government Corporations of the Appropriations Committee of the House of Kepresentatives that the two committees, sitting as a joint committee, had unanimously adopted a resolution that all sales of permanent war housing be for cash. The Commissioner of PHA replied that he would comply with the request, but that present occupants and veterans would not be able to compete successfully on a cash basis. He then, on March 4, 1947, instructed his regional offices that all ne *400 gotiations thereafter be for sales for cash. The House of Representatives passed a bill requiring such sales to be for cash, but the Senate did not pass the bill.
On March 10, 1947, another committee of veteran-occupants of the Knox project met with representatives of PHA to resume negotiations. They were advised of the policy requiring cash sales. On May 16 PHA advertised for bids on the project, the bids to be submitted by June 25. The advertisement said that bid forms and general conditions covering the sale would be mailed upon request. The bid forms stated that the property might be purchased upon terms. Two bids were received and both were rejected. The plaintiffs’ bid for $115,100, on terms, was the higher. The lower bid was for cash.
The bids in response to the advertisement having been rejected, PHA, pursuant to an unpublished regulation, undertook to sell the property by negotiation. Negotiation with the plaintiffs resulted hi an agreement to sell the property to the plaintiffs for $150,000 cash. On August 7,1947, details as to the corporate name in which title would be taken were arranged, and it was agreed that payment would be made and title taken on September 30. A press release, announcing the sale and saying that title would be transferred to the purchaser on September 30, was issued on August 8, and copies were given to the plaintiffs. The Government’s formal acceptance of the offer was dated August 20. The contract provided that the purchaser should have a reasonable period of time, not to exceed 30 days from mailing of notice of acceptance, for examination of title; that on or before the expiration of the 30 days, provided no defects of title had been shown, the purchaser should tender the purchase price; and that upon receipt of the purchase price, the Government would deliver the deed. The contract provided that all rentals from tenants accruing up to the date of settlement should accrue for the benefit of the Government, and that all rentals accruing after the date of settlement should accrue for the benefit of the purchaser.
Although the provisions of the formal contract might have resulted in another date for settlement, the parties understood, and the Government’s written press release *401 stated, that settlement was to be on September 30. The desirability of that date for the transfer of the right to the rents was obvious. From August 7 to September 30 two of the individual plaintiffs spent most of their time at the project, arranging the multitude of details that would be involved in taking over the property. PILA was also arranging its accounts on the basis of the September 30 closing date.
Soon after the announcement on August 8 of the sale of the project to the plaintiffs, agitation in opposition to the sale began. There were allegations that the tenants were barred from making an offer of $175,000 for the project, and denials by the PHA that there had been any attempt to make such an offer. Support to the veteran-occupants was given by the Indiana State Department of the American Legion and by the Legion’s National Convention. Just before September 28 the Indiana Legion asked the Attorney General of the United States to investigate the sale to determine if it could be set aside, and said that an injunction suit would be filed if the sale was not delayed. On September 28 the senior United States Senator from Indiana, the Governor of the State, and the Congressman from the district where the project was located, sent telegrams to PHA urging that the transfer be deferred.
On September 26 it was agreed that the closing would be at 10:30 a. m. on September 30. The Chicago office of PHA decided on September 29 to have the closing at 2:30 p. m. instead, but did not notify the plaintiffs of the change. The plaintiffs appeared with their money at 10:30 a. m. on the 30th. But during that morning, the Commissioner of PHA, in Washington, acting under instructions from his superior, the Administrator of Housing and Home Finance Agency, advised the PHA’s Chicago office that the sale should be postponed for 10 days “in order to give the tenants and others who are protesting an opportunity to present their case.” The Chicago office so telegraphed the plaintiffs at the project. The plaintiffs telegraphed their objections and demanded “delivery of the deed today or soonest possible.”
On September 30, two separate suits were filed challenging the sale to the plaintiffs. One was in the United States *402 District Court for the Northern District of Indiana, the other in the comparable court for the Northern District of Illinois. The petition in the Indiana proceeding was filed by “a veteran of World War II [suing] individually and on behalf of all other veterans similarly situated,” and naming as defendants the United States, the Federal Public Housing Administration, and Knox Homes, the corporate plaintiff herein. The suit asked that the purported sale be declared void and its consummation be enjoined.
The defense of the Indiana suit was referred by the Attorney General of the United States to the United States Attorney for the Northern District of Indiana. Its preparation required clearances between the Department of Justice and the General Counsel of PHA in Washington, the Regional Counsel and Regional Director of PHA in Chicago, and the United States Attorney in Fort Wayne, Indiana. The Government’s motion to dismiss was filed on November 26, and its motion for summary judgment on December 2. On November 28 the Government requested a hearing at the earliest date possible. The case was heard on December 12 and 22, 1947, and the petition was dismissed with prejudice on January 12,1948. The Illinois proceeding was dismissed on the motion of the petitioners therein on February 3,1948.
The Indiana proceeding having been dismissed by the District Court on January 12, 1948, PHA was advised by Government attorneys that, under a possible interpretation of the rules governing appeals, the appeal period might not expire for 90 days, or until April 12, 1948. The plaintiffs challenged this reading of the rules, contending that the period would expire in 60 days, and that it was unreasonable to await the expiration of the 90-day period.
On April 16, PHA sent to the plaintiffs a copy of the proposed deed, saying that PHA was ready to transfer the title, and listing the amounts to be paid and accounts to be settled. The plaintiffs responded promptly saying they would accept the deed and pay the amounts listed, but would reserve their claims against the Government for the rents which had accrued after September 30, and other damages which accrued on and after that date. PHA re *403 sponded that it did not recognize any claims such as the plaintiffs had mentioned.
On April 28, 1948, settlement was made and the deed delivered. When the individual plaintiffs went back to Knox after April 28, they found that antagonism toward them had increased, and was intense. Tenants refused to pay their rent, necessitating suits for arrearages and some evictions ; some occupants who had made agreements to purchase homes in the project refused to: carry out their agreements until the sale prices were reduced; businessmen in the town refused to cooperate with the plaintiffs in the sale of units to the occupants. On May 10, 1948, the Committee of the House of [Representatives on Expenditures in the Executive Departments, after hearings on April 28, 27, and 28, made a report strongly criticizing the PHA and recommending that that agency declare the sale null and void and re-offer the property to the veterans and occupants. During the seven months’ delay, economic conditions had deteriorated somewhat, and the PHA. in 1948 offered the nearby Walker ton and Kingsford projects for sale at prices lower than the plaintiffs had been asking for their proj ect in September 1947.
Going back to the time in 1947 when the title should, according to the agreement, have been transferred, Arnold S. Levin, one of the individual plaintiffs, upon being served with proceess in the Indiana proceeding on October 6, wrote the PHA stating that the suit was a cloud on the title to the property and that the title which the Government could convey, after the suit was filed, would not be marketable. He requested that the Government remove the cloud upon the title as soon as possible by appropriate action to effect a dismissal of the case with prejudice, and that the time for the tender of the purchase price be extended to the time when the action should be dismissed. The PHA promptly agreed to the extension.
The plaintiffs and the Government had a valid contract for the purchase and sale of the real property here involved. The facts recited above show that, at the agreed time for the transfer of title, there was much confusion in the minds of the public, and of powerful and influential groups and officials, as to whether the sale was lawful. In the circum *404 stances, it was quite natural that the Public Housing Officials involved should want to postpone, temporarily at least, the closing of the sale. To have put the sale through on time in complete disregard of the request of the Senator, the Governor and the Congressman for postponement, would have given the impression that those who opposed the sale were to be confronted with an accomplished fact, so that further discussion or argument would be futile.
We have said that the temporary postponement was the natural thing to do, in the circumstances. We also think that it was not a violation of the plaintiffs’ rights. Ordinarily in the sale of real estate, it is not of great importance whether the deed is made on a certain day, or a week or sometimes a month later. The real ownership of the property has passed by the making of the contract, and if the formal passing of the title is delayed, the interests of the parties can be adjusted according to their rights, under the contract and in equity. The plaintiffs say that in this case time was of the essence, because of the suits which were filed on the agreed closing date. Assuming that the filing of the suits before the transfer was made did change the situation materially, that would not mean that the parties had agreed that it was essential that the closing be on that date. It would mean only that an event had occurred on that date which had important consequences. That occurrence, for which the vendor was not responsible, would not make the vendor guilty of a breach of contract, and liable for all the consequences of the occurrence.
We are not convinced that the postponement of the closing, which resulted in the suits being filed before the deed was delivered, had important consequences. The Indiana suit asking that the transaction be declared void would, no doubt have been filed, whether the deed was delivered or not. The relief sought, a declaration that the transaction was void and the enjoining of its consummation, could have been given after the deed was made as well as before. We have grave doubt that the plaintiffs would have been willing to put their money irrevocably into the Government’s hands, in the face of such a suit. The plaintiffs would have expected *405 the Government to defend the suit, and it might well have taken as long to get the suit disposed of as it took in the instant case. Until it had been disposed of, the plaintiffs’ title would have been, in fact, unmarketable, and the tenants would have had as much reason to refuse to pay their rents, and the businessmen would have had as much reason to refuse to cooperate with the plaintiffs as they had in the instant case. The plaintiffs’ misfortunes were the result of the whole combination of events, and not of the single, uncomplicated fact that they did not get their deed on September 30.
The contract of sale, plus the agreement as to the closing date, gave the plaintiffs the right to the benefits of ownership from September 30, 1947. The contract did say that rents should accrue to the vendor until the date of settlement, and to the purchaser thereafter. That certainly did not mean that the acquisition by the purchaser of the benefits of ownership should depend upon the accident of whether some third person would file a lawsuit and thus compel the postponement of the closing for months. The plaintiffs were, from and after the agreed closing date, the equitable owners of the property. As such they were entitled to the rents, less the costs, to the extent that the costs were reasonable, of maintaining the property and collecting the rents.
Our conclusion is that the plaintiffs are not entitled to recover damages for breach of contract because of the nondelivery of the deed on September 30,1947, but are entitled to recover the rents collected by the Government for the period October 1, 1947, to April 28, 1948, less the costs of maintenance and collection. If the parties can stipulate the amount due, judgment for that amount will be entered. If not, the case will be remanded to a commissioner of this court to take evidence and make a report upon that issue.
It is so ordered.
Whitaker, Judge; Littleton, Judge; and Jones, OMef Judge, concur.
Laramore, Judge, took no part in the consideration or decision of this case.
*406 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. The individual plaintiffs are brothers. All are residents of Ohio and citizens of the United States. The corporate plaintiff is an Indiana corporation, chartered on August 5, 1947. At all times material to this action the corporate plaintiff was wholly owned by the individual plaintiffs.
2. In 1943 defendant[1] built a war housing project consisting of 139 dwelling units at a cost of $462,000 in the town of Knox, in Starke County, Indiana. The project was known as Parkview Heights.
In October 1946, the property was found to be surplus to the needs of the United States and became subject to sale.[2]
3. Occupants of Parkview Heights, including several veterans, interested in purchasing the property, formed a Committee for Mutual Ownership of Parkview Heights. Responding to the group interest, PHA agreed to withhold the property from public sale for a time to permit the occupants to make a proposal. On January 6,1947, the committee met with PHA officials and was told that the property could be purchased at the PHA appraised price of $215,717, on terms of 20 percent down, with the balance payable in 10 years at 4 percent interest.
4. On February 3,1947, the Committee for Mutual Ownership of Parkview Heights made a counter proposal of $100,-000, on terms. This offer was rejected, and the committee was so informed on February 12, 1947, with the further advice (a) that the project could no longer be withheld from sale and (b) that the committee could bid when the property was offered for sale in the open market. The committee *407 thereafter made no further effort to purchase the property, and was soon succeeded by another committee comprised of individuals, including veterans, among the occupants of Parkview Heights. The latter committee is hereinafter referred to as the veteran-occupants committee.
5. (a) The statute[3] authorized the sale of the property “for cash or credit,” the transaction to be upon “such terms * * * as may be deemed * * * to be in the public interest.”
(b) On February 25,1947, the Commissioner of PHA was advised by the Chairman, Committee on Banking and Currency, and the Chairman, Subcommittee on Government Corporations, Appropriations Committee, of the House of Representatives:
* * * The joint committee adopted unanimously the following resolution, based upon the understanding which you gave * * * that you would follow the recommendation of the committee at this time so that the Banking and Currency Committee could, within a reasonable time, establish a definite program with regard to the disposition of permanent war housing units. The resolution * * * follows:
Resolved, That it is the sense of this joint committee that sales of permanent war housing units * * * be limited to such transactions as will return all proceeds of the sales in cash * * * at the time of the * * * sales.
(c) On February 28,1947, the Commissioner of PHA replied :
* * * While I shall, of course, comply with your request, I wish to emphasize that, in my judgment, the adoption of a permanent policy that would permit sales of war housing projects only for cash would not be in the public interest * * *. * * * the overwhelming majority of present occupants and veterans would be unable to compete successfully on that basis.
(d) On March 4, 1947, the Commissioner of PHA issued instructions to regional offices requiring that all negotiations for sales of war housing projects not under binding commitment should thereafter be conducted on the basis of cash sales only.
*408 (e) Legislation of the kind contemplated by the joint committee mentioned in subparagraph (b) of this finding was later passed by the House of Representatives but failed of adoption in the Senate. Meanwhile, the Congress did enact legislation providing for the insurance of loans made to veterans to purchase housing.
6. On March 10,1947, the veteran-occupants committee met with representatives of PHA in Chicago to undertake negotiations for the property.[4] The committee was advised of the policy requiring cash sales.
7. On May 16,1947, PHA advertised for bids on Parkview Heights to be submitted on or before June 25, 1947. The advertisement stated that bid forms and general conditions covering the sale would be mailed upon request. The bid forms stated that the property might be purchased upon terms.[5]
Two bids were received. Both were rejected. One of the bids was submitted by the Parkview Homes Company, a trade name adopted by the individual plaintiffs herein for the purpose of bidding and used by them in subsequent negotiations for the property. The bid so submitted by the individual plaintiffs was in the amount of $115,100, on terms. It was the higher of the two bids. The lower bid was for cash.
*409 8. Some of the regulations of HHFA and PHA were published; others were not.[6] One of the published regulations authorized PHA to accept a lower bid. It was silent as to authority for sale by negotiation. An unpublished regulation provided, in effect, that if an acceptable bid was not received in response to advertisement, the project might be sold by negotiation.[7]
9. (a) Representatives of defendant entered into negotiations with Parkview Homes Company, represented by Arnold S. Levin. The negotiations culminated in an oral agreement between the negotiators for the sale of Parkview Heights to Parkview Homes Company for $150,000, cash.[8] In the name of Parkview Homes Company Levin submitted a bid, with which there were deposited cashiers checks total-ling $3,001.
(b) On July 31,1947, defendant telegraphed Levin:
We are authorized to close sale of project * * * for $150,000 cash * * *. Request you wire immediately and confirm by letter your cash offer and that cashiers checks totalling $3,001 * * * previously deposited * * * shall constitute earnest money to bind the sale * * *. Such sale shall * * * be subject to general conditions and restrictions applied to public war housing per our standard form of offer being furnished you.
(c) On August 1, 1947, Levin replied:
This confirms offer $150,000 cash for Knox. Cashiers checks totalling $3,001 constitute earnest money. Letter follows.
10. In using the name “Parkview Homes Company” it had been the intention of the Levin brothers, if their negotiations were successful, to form a corporation. The telegram from Levin to defendant, set forth in finding 9 (c), was signed “Parkview Homes, Inc.” After that telegram was sent, the *410 Levin brothers set about to form a corporation under the laws of Indiana, using the name “Parkview Homes, Inc.” They found the name preempted in Indiana, and accordingly applied for and obtained articles of incorporation of Knox Homes, Inc. They preferred the use of the corporate device for purposes of financing and management.[9] The paid-up capital stock of Knox Homes, Inc., was $500. The four Levin brothers were the incorporators and comprised the first board of directors. Albert A. Levin was president; Arnold S. Levin was secretary.
11. By letter dated August 5, 1947, defendant acknowledged receipt of Levin’s telegram of August 1 and forwarded four copies of “offer forms, conditions of sale and Schedule £A’ attached thereto.” At this time PHA officials contemplated a formal contract with a corporation named “Park-view Homes, Inc.”
12. On August 7, 1947, Albert A. Levin and Arnold S. Levin (president and secretary of Knox Homes, Inc.) were in the Chicago office of PHA. At their meeting with PHA representatives discussion was had and agreement reached (prior to the signing by the Levin’s of the offer form) on the following matters, among others: (1) the offer forms would be revised for signature by Knox Homes, Inc., instead of Parkview Homes, Inc.; (2) a press release, previously prepared, would be similarly revised and would be issued the next day; (3) the Levins would be permitted to use one room in the project office as the headquarters of Knox Homes, Inc., in making arrangements to take over the ownership and management of the property, beginning immediately and extending to the date of settlement; and (4) the date for settlement and closing would be September 30, 1947.
The two Levin brothers then signed the offer form in behalf of Knox Homes, Inc.
The Government’s acceptance of the offer, as noted by the signature of the Assistant Director for Keal Estate and Disposition of PHA, was dated August 20, 1947.
*411 13. The press release, as given to the two Levin brothers on August 7,1947, and as issued to the press the next day, read as follows (in pertinent part) :
The * * * Public Housing Administration * * * has entered into a contract of sale with the Knox Homes Corporation for the sale of Parkview Heights, a war housing project of 139 dwelling units located at Knox, Indiana, it was announced today by * * * Director oi the Chicago Regional Office of the PHA.
Title to the property will be transferred to the purchaser as of September 30,1947, at which time full cash payment will be made to the PHA, as required under present policy governing the disposition of government-owned war housing.
Government operation of the project will end on September 30, 1947. Occupancy subsequent to that date will be under the operation of the Knox Homes Corporation * * *.
14. The contract of sale is in evidence as plaintiffs’ Exhibit No. 1, which is incorporated herein by reference.
The contract consists of an “offer and acceptance of offer to purchase real estate,” on one page (which bears the signatures of purchaser and seller), to which is attached (1) general conditions of sale of real property and (2) Schedule A (being primarily devoted to the legal description of the property).
The contract was prepared by defendant.
15. (a) The “offer and acceptance * * *” is in the form of a memorandum addressed to the seller by the purchaser. It is dated August 7, 1947. Pertinent portions follow:
1. The undersigned * * * “Purchaser” has been furnished by * * * the “Seller” with a copy of “General Conditions of Sale of Real Property” dated August 1, 1947, hereinafter referred to as the General Conditions, setting forth the conditions under which PHA project * * * at Knox, * * * Indiana, will be sold.
2. The Purchaser offers and agrees to purchase from the Seller for cash in the full amount of the purchase price * * * $150,000 * * * Project * * * Knox, as ... * * ¿escribed in “Schedule A” attached to the General Conditions, such offer being governed by and subject to said General Conditions * * *.
*412 3. The Purchaser tenders herewith as an earnest money deposit * * * $3,002.00 to be held and applied as set forth in the General Conditions the balance of the purchase price to be paid to the Seller at the time of settlement as required by the General Conditions.
4. This offer shall be binding upon the purchaser * * * in the manner and for the period, and may be accepted by the Seller, all as set forth in the General Conditions.
(b) The General Conditions bore the date August 1,1947, and contained the following provisions:
1. The Purchaser * * * shall submit his offer on or before 20 days from the date of these Conditions * * * and said offer shall be conditioned on, and be governed by, the General Conditions of Sale herein set forth.
2. The amount of the deposit made by the Purchaser shall be applied against the purchase price * * *. When the offer is accepted, the purchaser will be so notified.
3. The offer may not be withdrawn without * * * consent * * * for a period of 30 days after the date thereof and the offer may not be withdrawn after the mailing of notice of acceptance thereof by the Government. The Government reserves the right to reject the offer if * * * such action * * * be in the public interest. * * *
6. * * * The Government shall deliver possession as of the date of settlement * :|: *. * * * The purchaser will have a reasonable period not to exceed 30 days from mailing of notice of acceptance * * * for examination of title. If it is found that the title is not marketable * * * and the Government does not perfect the title within a reasonable time, the purchaser may withdraw the offer and may obtain a refund of his deposit and reimbursement from the Government for reasonable expenses of title search. Failure to furnish an opinion of a qualified title attorney within 30 days showing that the title is not marketable * * * shall be deemed a waiver * * * as to all title defects.
7. On or before termination of said 30 days (provided no defects of title * * * have been shown) the purchaser shall tender to the * * * PHA * * * the balance due on the purchase price. Upon receipt of the full amount of the purchase price the Government will deliver to the purchaser a deed conveying the property. In the event the purchaser fails or refuses to make such tender, the deposit made by the purchaser shall be retained by the Government as liquidated damages.
*413 8. The Government reserves the right to refund the deposit and withdraw its acceptance of the offer at any time prior to conveyance of title in the event that the Government cannot deliver possession of the property by reason of fire or any other cause.
9. * * * fuel * * * supplies * * * and other items * * * shall be prorated between the Government and the purchaser as of the date of settlement. All rentals from tenants * * * accruing up to the date of settlement shall accrue for the benefit of the Government * * *. All rentals * ? * accruing after such date of settlement shall accrue for the benefit of the purchaser. * * *
16. (a) The agreement as signed did not specify a closing date, but did, by its terms, contemplate settlement on or before September 20, 1947, unless defects in the title were found, in which event the seller would have had a reasonable time within which to perfect the title.[10]
(b) The parties were fully aware of the terms of their contract when they agreed upon September 30 as the closing date. PHA preferred a settlement at the end of the calendar month for convenience of accounting, and offered on August 7, to close on August 31. When the purchaser demurred because of the shortness of the time within which to examine title and make final arrangements, PHA suggested September 30 and the purchaser agreed.[11]
17. On and after August 7, until September 30, the purchaser and the seller accepted September 30,1947, as the closing date, and made preparations accordingly.
The press release of August 8 (finding 13) was posted on the bulletin board. On September 12 detailed advice regarding the anticipated transfer was given to the tenants in a letter addressed to them by defendant’s project manager. Similar advices were given to the tenants by Knox Homes, Inc., in a letter dated September 19.
*414 The purchaser established an office at the project and began interviews with tenants, including negotiations for the sale of various dwelling units to the occupants, the sales to be consummated when the transfer was made from PHA to Knox Homes, Inc. Two of the Levin brothers spent most of their time at the project from August 7 to September SO.
Arrangements were made by the purchaser to transfer the utilities, including streets and sewers, electric, gas, and water supplies, to other owners.
As the end of September approached PHA arranged for the closing of all accounts (receipts for rentals and disbursements for utilities) and notified the purchaser of the precise balances due to be paid by it in the settlement on September BO. The purchaser made final arrangements accordingly.
18. The Levin brothers were unable to obtain the kind of financing they wanted in the name of Knox Homes, Inc., and therefore raised the necessary money through borrowings on their personal responsibility. These funds were not paid over to the corporation but were held by the individual plaintiffs. On September 21,1947, a written agreement was executed by Knox Homes, Inc., acting through Albert A. Levin, president, and Arnold S. Levin, secretary, and the four brothers as individuals. Pertinent portions of the agreement follow:
Whereas, Albert A. Levin, Arnold S. Levin, Frank K. Levin, and Jacob Levin, have organized a corporation known as Knox Homes, Inc., for the purpose of purchasing * * * Parkview Heights * * *; and
Whereas, the * * * purchase was to be made by the corporation for the purpose of avoiding individual liability in the financing * * *; and * * *
Whereas, it now appears that the corporation will be unable to finance said purchase * * *; and
Whereas, * * * it will be necessary that the individuals each sign personally for the financing necessary to complete said transaction; and
Whereas, the individuals have loaned money to the corporation * * * and desire to take over said contract * * *;
Now, therefore, in consideration of the individuals * * * hereby cancelling and satisfying all obligations arising out of loans from the individuals to Knox *415 Homes, Inc., Knox Homes, Inc., hereby sells, assigns * * * and conveys to [the individuals, named] all its rights arising out of said contract and all other property of Knox Homes, Inc., * * *.
Knox Homes, Inc. further agrees to act as agent for [the individuals, named], who are the principals, without disclosing that said individuals are the principals, for the purpose of * * * acquiring * * * managing and operating said property * * * and for any other purpose in connection with the subject matter * * * so long as the [individuals, named], as principals, desire Knox Homes, Inc. to act as their agent.
The individuals agree to pay all expenses incurred by the * * * agent in the performance of its agency. * * *
All parties to the agreement observed the injunction relating to undisclosed principals.
19. (a) Soon after the sale of Parkview Heights to Knox Homes, Inc., was announced on August 8, 1947, dissatisfaction became evident among occupants of the houses over their failure to acquire the property from PHA.[12]
(b) On September 3,1947, the Starke County Republican published a report, a part of which follows:
At a protest meeting August 8 of more than 100 occupants of Parkview houses it was decided to “sit tight.” A committee to look after the interests of the group was appointed. Other than the publicity given the matter through South Bend and Chicago papers, the situation of the residents at Parkview has not been changed, except that some are planning to move and others have been notified that their places have been sold.
Charges by resident veterans of Parkview Heights * * * that they were not given an opportunity to purchase the project homes at a price acceptable to the government, are emphatically denied by Orvil R. Ohnsted, Director of Chicago Regional Office of the Public Housing Administration, in a communication dated August 28 * * *. * * *
*416 (c) The Starke County Democrat, on September 3, 1947, carried the PHA press release of August 28 without comment. Part of it follows:
“Specifically, I wish to refute the charges attributed to John K. George, a Parkview Heights resident, that the project tenants were barred from making an offer of $175,000 for the project which was subsequently sold for cash to the Knox Homes Corporation for $150,000,” Mr. Olmsted stated. “Every possible opportunity was given to Parkview residents to make such an offer, which they never made, as the following summary of actions will reveal. * * *”
(d) On September 23, 1947, Mr. Olmsted, Director of Region III, PHA, wrote to the State Commander, Department of Indiana, American Legion, in part as follows:
My attention has been called to a story appearing in the Gary Post Tribune of September 16, which stated that you had announced that the Indiana State Department of the American Legion would finance an investigation of the sale of the * * * project at Knox * * * to the Knox Homes Corporation. This same story stated that the investigation had been ordered by the Legion’s National Convention because of a protest by * * * the Legion’s National Committeeman of Indiana, that the veterans had been prevented from buying the homes they had been renting. * * *
I am taking the liberty of writing to you in order to correct the record and furnish you with the factual record of the principal steps in the negotiations which led to the sale of Parkview Heights to the Knox Homes Corporation. The following resume is an extract from my statement * * * to the press under date of August 28, 1947. * * *
(e) On September 27,1947, the National Judge Advocate of the American Legion, replying for the Indiana Commander, wrote Mr. Olmsted:
* * * the Knox Housing situation was brought to the attention of the National Convention of The American Legion recently held in New York, and action was taken calling for a complete investigation of the sale to Levin Brothers. Furthermore, the Indiana Department * * * at a meeting * * * held September 13, appointed a Committee with directions to investigate this situation, and voted sufficient finances for that purpose. * * *
*417 * * * the sale should be postponed and a conference should be held by your office with the Legion Committee, in order that this matter may be satisfactorily adjusted. If this is not done we are directed to institute legal proceedings to question the validity of the transaction.
(f) On September 28, 1947, a Chicago newspaper carried a report with an Indianapolis dateline to the effect that the housing chairman of the American Legion in Indiana had asked the Attorney General of the United States to investigate the sale of Parkview Heights, “to determine if the sale * * * can be set aside.” The story further quoted the Commander of the Indiana Department as saying that an injunction suit would be filed if the Legion was unsuccessful in efforts to delay the sale.
(g) On September 28, 1947, separate telegrams urging that the transfer of the property to Knox Homes be deferred were sent to PHA by the senior United States Senator from Indiana, the Governor of the State, and the Congressman from the Ninth District.
20. Meanwhile, on September 26, agreement was reached between purchaser and seller to schedule the settlement for 10: 30 a. m., on September 30, at Parkview Heights, in Knox, Indiana.
The purchaser was present at the appointed place and time and was prepared to tender the required payments and to accept the deed. No appearance was made by PHA.
21. During the afternoon of September 29 decision had been made in the Chicago office of PHA to postpone the closing from 10:30 a. m., to 2:30 p. m., on September 30. The purchaser was not notified of this decision.
22. Sometime during the morning of September 30, the Commissioner of PHA, in Washington, acting under instructions from the Administrator of HHFA, telephoned the Director of PHA’s Region III, in Chicago, and advised that the Administrator had requested the postponement of final closing of the sale for 10 days “in order to give the tenants and others who are protesting an opportunity to present their case.”
The Director of Region III thereupon telegraphed the purchaser, at 1: 35 p. m.:
*418 We have been instructed by our Central Office this morning to defer closing of sale * * * for * * * ten days to permit review and investigation of the authority under which the sale was agreed to. Tender of balance waived during such period.
This message was telephoned to the purchaser at 1:49 p. m. It promptly replied by telegram:
* * * we are prepared to pay balance purchase price today. We request delivery of deed today or soonest possible. We object to postponement of closing. Postponement is causing us serious damages.
23. (a) When the Administrator of HHFA determined to direct postponement of the closing, he knew (1) that the protests against the action of PHA in selling to Knox Homes, Inc., had been made by the American Legion; (2) that the protests challenged the legality of the action of PHA; (3) that these protests and challenges had engaged the attention of men holding high and responsible positions in public life; and (4) that some of these men earnestly believed that the challenges of the legality of the action of PHA warranted review and consideration by the highest officials of HHFA.
(b) On the basis of his knowledge the Administrator believed (1) that representatives of the American Legion should have an opportunity to present their case; (2) that review of the situation, including legal questions involved, should be made by his office; (3) that the presentation and review could be made within 10 days; and (4) that a 10-day postponement of the closing was reasonable under the circumstances.
(c) When the Administrator of HHFA determined to direct postponement of the closing, he did not know that the duration of any postponement which he might order would be almost immediately removed from his control by virtue of the filing of legal proceedings to stop the sale.
(d) When the Administrator of HHFA determined to direct postponement of the closing, information was available through the normal channels of his office and the public press of such nature that he reasonably should have known that the duration of any postponement which he might order would be almost immediately removed from his control by virtue of the filing of legal proceedings to stop the sale.
*419 24. On September 30,1947, two separate proceedings challenging the sale were filed: one was in the United States District Court for the Northern District of Indiana, and is hereinafter referred to as the Indiana proceeding; the other was in the United States District Court for the Northern District of Illinois, and is hereinafter referred to as the Illinois proceeding.
The petitioner in the Indiana proceeding was an occupant of Parkview Heights. He sued as “a veteran of World War II individually and on behalf of all other veterans similarly situated and interested,” naming as defendants the United States of America, Federal Public Housing Administration, and Knox Homes, Inc. On the basis of the facts alleged in the petition, the prayer for relief asked that “upon a hearing of this controversy on its merits the Court (a) nullify and declare void said purported sale [and] (b) enjoin the defendant [s] * * * from consummating said purported sale $ ‡ H
25. The defense of the United States and PHA in the Indiana proceeding was referred to the United States Attorney for the Northern District of Indiana by the Attorney General. Correspondence pertaining to the defense passed between the United States Attorney, the Attorney General, and the General Counsel and Regional Counsel of PHA.
On October 11, 1947, Arnold S. Levin wrote the United States Attorney:
We [Jacob Levin and Arnold S. Levin, practising as Levin & Levin] represent Knox Homes, Inc., in the [Indiana proceeding]. * * * Since the action questions the validity of the contract between the government and our client, it is our impression that the interests of the defendants in this action are mutual and, therefore, we wish to cooperate with you to the fullest extent in the defense * * *. We hope that you will see fit to reciprocate. * * *
Enclosed with the letter was a draft of the answer which had been prepared for Knox Homes, Inc. The letter also contained a request for a conference with the United States Attorney.
On October 24, 1947, Arnold S. Levin, for Levin & Levin, wrote to the Director of Region III:
*420 * * * We received no response from [the United States Attorney] and, therefore, telephoned him yesterday. He states that he has not been able to give attention to our letter and the case involved and promised to do so today.
It is now 24 days since the lawsuit was filed and no action has been taken by the government in the case. We do not consider this as prompt action to dispose of the case. * * *
This was the first of a series of letters to various of defendant’s officials in which the Messrs. Levin took the positions (1) that the failure of defendant to complete the settlement on September 30 was a breach of contract; (2) that Knox Homes, Inc., was entitled to all rentals accruing on and after October 1; (3) that continuing delay in the closing was causing continuing and increasing losses to Knox Homes, Inc.; and (4) that the Government’s failure to bring the Indiana proceeding to issue, hearing, and disposition sooner than was done constituted an unreasonable delay.
Responses by defendant’s officials to the various letters from the Levins took issue with every point.
26. The defense ojf the United States and PHA in the Indiana proceeding involved various clearances between the Department of Justice and the General Counsel of PHA in Washington, the Kegional Counsel and Regional Director of PHA in Chicago, and the United States Attorney in Fort Wayne, Indiana.
The Government’s motion to dismiss was filed on November 26, followed by a motion for summary judgment on December 2. In the meantime, on November 28, the United States Attorney requested the court for a hearing at “the earliest date possible.”
The matter was heard by the court on December 12 and 22, 1947. On January 12, 1948, the cause was dismissed with prejudice.
It is not established by the evidence that there was either ' willful delay or lack of diligence on the part of Government counsel or any official of PHA in the defense of the Indiana proceeding.
27. (a) None of the plaintiffs herein was named as a defendant in the Illinois proceeding.
*421 (b) The Illinois proceeding was dismissed on motion of the petitioners therein on February 3, 1948.
(c) It is not established by the evidence that there was either willful delay or lack of diligence on the part of Government counsel or any official of PHA in the defense of the Illinois proceeding.
28. Dismissal of the Indiana proceeding was ordered on January 12, 1948. Attorneys for the Government took the position, and so advised PHA, that, under a possible interpretation of the rules governing appeals, the appeal period might not expire for 90 days, or until April 12, 1948. The Messrs. Levin challenged this interpretation, contending for the interpretation that the appeal period would expire at the end of 60 days, or on March 12, and further contending that action based on the 90 days’ interpretation constituted unwarranted and unreasonable delay.
It is not established by the evidence that the action of PHA in deferring settlement until the appeal period, as established by the advice of counsel, had expired, was unwarranted or unreasonable or done in bad faith.
29. Immediately upon being served with process in the Indiana proceeding, on October 6, 1947, Arnold S. Levin wrote to the Director of Kegion III of PHA:
* * * I have practiced law since * * * 1934 * * * and have had extensive experience in examination of titles and as legal counsel in real estate transactions. In my opinion, [this] * * * action is now a cloud upon the title * * * and * * * the title which the government could now convey * * * would not be marketable.
* * * it is requested that the government remove this cloud upon the title as soon as possible by appropriate action * * * to effect a dismissal of the case with prejudice * * *.
* * * it is requested that the time for tender of the balance of the purchase price * * * be extended to such time as the * * * action is dismissed. * * *
On October 10, 1947, the Director of Kegion III replied by telegram:
* * * tender of balance due on purchase price * * * waived until further notice as set forth in our letter to follow.
*422 The letter of confirmation was written on October 13, 1947. In it defendant “noted” plaintiffs’ statements and requests concerning the cloud on title and extension of time for tender of the balance, and added:
* * * the date for tendering the balance due on the purchase price * * * is hereby waived until further notice. You will be notified as far in advance as possible of the date on which this waiver will expire. Meanwhile, we will take prompt steps to urge the Department of Justice to dispose of the pending litigation.
30. (a) The PHA never explicitly agreed that the Indiana and Illinois proceedings constituted a cloud on the title. PHA never requested or suggested the submission, and the purchaser never tendered, the “opinion of a qualified title attorney” not a party to the transaction “showing that the title” was “not marketable” because of the injunction proceedings.
(b) PHA never sought to lift its waiver of tender of the balance of the purchase price until both the Indiana and the Illinois proceedings had been dismissed and until the appeal period in the Indiana proceeding had expired.
(c) PHA never sought “to refund the deposit and withdraw its acceptance of the offer” on the ground that “the Government cannot deliver possession of the property * * *”, or for any other reason.
(d) The purchaser never sought to withdraw the offer or to obtain a refund of its deposit or reimbursement for reasonable expenses of title search.
(e) On and after September 30, 1947, until the date of settlement on April 28, 1948, the purchaser consistently maintained, in its correspondence and dealings with PHA, (1) that PHA was bound by contract to make the settlement and deliver the deed on September 30, 1947; (2) that the failure of PHA to close the transaction on that date was a breach of contract, as a result of which damages for which PHA was legally responsible had accrued and were continuing to accrue; and (3) that the breach of the contract in relation to the September 30 closing date did not alter, modify, or suspend the obligation of PHA to deliver title as soon as possible.
*423 31. On April 16,1948, the Director of Region III of PHA forwarded to Messrs. Levin & Levin a copy of the deed. His forwarding letter advised that he was prepared to close the sale, and listed the payments to be made and accounts to be settled. Messrs. Levin & Levin replied on April 17,1948:
* * * Knox Homes, Inc., will close the transaction with the government by paying over the sums requested in your letter and by accepting the government’s deed, reserving however its claims against the government for rents collected by the government for periods subsequent to September 30, 1947 and other damages accruing on September 30,1947, and thereafter to the date of closing.
On April 21,1948, the Director, Area B, Region III, wrote to Messrs. Levin & Levin:
* * * the Government does not recognize any claim in favor of Knox Homes, Inc., against the Government, based upon any of the matters referred to in * * * your letter, or upon any other matters.
32. On April 28, 1948, the settlement was made. Knox Homes, Inc., made the specified payments (with money supplied to it by the individual plaintiffs) and accepted the Government’s quitclaim deed.
33. On May 10,1948, the Committee on Expenditures in the Executive Departments of the House of Representatives submitted its Eleventh Intermediate Report, based upon “hearings * * * held April 26, 27, and 28,1948, by a special subcommittee appointed to make inquiry as to the authority of the Public Housing Administration to sell Parkview Heights * * * to Knox Homes, Inc., * * After reviewing the evidence before it, the Committee concluded that—
* * * the veteran-occupants’ committee * * * offered $175,000 in cash, which offer the Agency rejected * * *.
* * * the committee representing the veteran-occupants was misled by the statements made by the Agency’s representatives that the minimum price was $215,717 and that the terms must be cash.
The committee’s recommendations follow:
1. That a copy of the committee findings and conclusions be submitted to the Housing and Home Finance Agency and the Public Housing Administration, with *424 a request that the sale be declared null and void; that the property be reoffered for sale and that the veterans and occupants be given the priority which Congress desired to extend to them; and that a copy thereof be sent to the President of the United States for his information.
2. That legislation be enacted relieving the Public Housing Administration of its discretionary power and circumscribing its action and conduct.
3. That, in the event the first suggestion is not or cannot be acted upon, legislation be enacted permitting the veterans and other occupants or their representatives to bring suit against the Agency and the United States Government and such other defendants as may be proper and necessary parties to obtain a judicial decree declaring the sale void and directing the Agency to reoffer the property for sale in accordance with the law.
4. That it is the unanimous opinion of the committee that the Agency do everything within its power to bring about the successful termination of negotiations between the veterans and Knox Homes, Inc., so that the veterans will obtain title to, and possession of, this property.
34. Sometime during May 1948, a fiery cross was burned in a vacant lot on the project property across from the project office. It is not established by the evidence when the cross was burned (in relation to the issuance of the report described in the preceding finding) or by whom it was burned. The individual plaintiffs regarded the incident as a display of antagonism against them on the part of occupants of Park-view Heights.
Such antagonism did exist. The resentment among occupants of Parkview Heights over their failure to obtain ^welling units by direct purchase from PHA centered on &he individual plaintiffs upon their return to Knox. The resentment had increased since September 1941. The individual plaintiffs had not visited the project after September 30, 1947, until the closing on April 28, 1948. The resentment of the occupants and their antagonism toward the individual plaintiffs had increased substantially in the meantime. The individual plaintiffs did not know of this increase until after the settlement. They could have known of it before the closing of the transaction if they had visited the community or made inquiry.
*425 35. The wide-spread antagonism of the occupants of Park-view Heights toward the individual plaintiffs found expression (1) in the refusal of tenants to pay rent, resulting in many arrearages and lawsuits and some evictions; (2) in the refusal of some of the occupants who had contracted with Knox Homes, Inc., to purchase their units from the corporation to honor their agreements until the sale prices provided in the agreements were reduced; and (3) in the unwillingness of businessmen in the town of Knox to cooperate with the individual plaintiffs (as representatives of the corporation) in the sale of dwelling units to the occupants.
36. On January 10, 1949, Knox Homes, Inc., wrote to the Director of Kegion III of PHA:
We again restate our claim against the * * * Public Housing Administration * * *. On August 7, 1947, the Government contracted to sell us * * * Parkview Heights * * *. * * *
From August 7 to September 30,1947, we relied upon the agreed closing date of September 30 and accordingly incurred expenses in connection with resale of the property by us to other individuals. Because you did not deliver the deed * * * until April 28, 1948, the benefit of these expenditures by us were lost to the extent as follows:
Advertising_ $700. 00
Appraisal by Veterans Administration Com-mittee_ 150.00
Time spent and expenses incurred by our officers_ 3,000. 00
With reference to the lawsuits * * * attacking the validity of the sale, the Government failed to take prompt action to dispose of same in order to mitigate our damages. * * *
* * * the delay * * * from September 30, 1947 to April 28,1948 was initially caused by the Government’s failure to deliver the deed on September 30,1947. * * *
* * * The rents which we would have collected * * * and which * * * the Government * * * should now pay to us, amount to * * * $23,207.50. * * *
* * * Our expenses in * * * defending the lawsuit amounts to $1,500.00.
*426 * * * Because we did not obtain title * * * prior to April 28 * * * we could not paint and caulk * * * and because of this, the buildings suffered extraordinary deterioration and depreciation in the amount of $7,175.00.
On September 30 * * * we were prepared to resell * * * to * * * individuals who were then desirous of purchasing * * *. Between that date and April 28 * * * market conditions * * * changed substantially for many reasons, one of which was that the Government offered its dwellings at nearby Kingsf ord * * * and Walkerton * * * at prices much lower than the prices at which we were able to resell the homes at Park-view Heights.
The * * * delay * * * caused * * * question ,[of] our title * * *. This * * * delay * * * caused bad publicity which impaired our ability to sell * * * and caused bad public relations.
The * * * money market * * * changed * * * between September 30 * * * and April 28, * * *. Because of the depreciated market conditions and less favorable home financing conditions, we were required to resell the property at prices less than we could have obtained on September 30 * * *. These changed conditions caused us a loss of $16,435.00.
* * * Total_$52,167. 50
We suggest * * * a conference * * * to discuss this claim * * *. * * *
37. On March 1, 1949, the Commissioner of PHA replied to the letter quoted in the preceding finding:
* * * your claim sounds in damages for breach of contract, and consideration and settlement of such cl aim a is beyond the purview of my authority * * *. Your letter has been reviewed, however, and I am unable to find that a valid claim is stated therein * * *.
* * * this Administration can afford you no relief * * * because of the nature of your claim and * * * because the facts * * * do not appear to establish any legal foundation for relief * * *. * * * it does not appear * * * that * * * conference * * * would serve any purpose.
*427 DAMAGES[13]
38. Delay, (a) The closing of the transaction was delayed from September 30, 1947, to April 28, 1948, a period of 30 weeks. Twenty-eight of the 30 weeks of delay were caused by the filing, defense, and disposition of litigation which was initiated by the American Legion at the behest of veterans who were occupants of Parkview Heights. Both the purchaser and the seller acquiesced in the delay necessitated by the pendency of the litigation. The remaining two weeks of delay were the result of agreement between purchaser and seller, following the situation created by the litigation.
(b) PHA could have prevented the delay by making settlement at the appointed time on September 30, 1947.
The failure of PHA to make an appearance for the settlement at the appointed time and place made it impossible for the purchaser to make a tender at such time and place.
(c) The initial postponement of the settlement (for 10 days) was ordered by PHA without consultation with the purchaser. When advised of the unilateral action of PHA, the purchaser acquiesced in the postponement.[14]
(d) The order for the 10-day postponement was made by the seller in good faith, but under such circumstances as to make the seller chargeable with knowledge that any postponement of the appointed time would probably encounter conditions which would remove from its control the duration of the postponement.
(e) When the purchaser acquiesced in the postponement (however reluctantly), it knew or reasonably should have known that any postponement of the appointed time would probably encounter conditions which would remove the duration of the postponement from the control of either purchaser or seller.
*428 39. Expenses in Preparation for Settlement. Some of the expenses incurred by the purchaser in preparation for settlement on September 30, 1947, might not have been necessary in preparation for settlement on April 28, 1948, because of changes in conditions between the two dates. The benefit of such expenses as were not so necessary were lost to the purchaser because of the delay.
40. Bents. The delay in closing deprived the purchaser of the rentals accruing for the period of the delay.
41. Depreciation. The purchaser intended to paint the buildings as soon as it obtained title. It asked and was refused permission by the seller to do the painting pending transfer. The seller did no painting during the period of delay. The buildings suffered some deterioration during such period of delay that might have been prevented by the timely application of paint.
42. Expenses of Defending Lawsuits. It is not established by the evidence that the expenses incurred by the purchaser in defending the Indiana proceeding would have been avoided if the settlement had been made on September 30.[15]
43. Lower Resale Prices, (a) The purchaser was unable, after it obtained title to the property, to resell the units at prices as high as its negotiations for sales in September 1947 indicated it might obtain. There were at least three reasons for this condition: (1) competition by PHA in its offering of the nearby Walkerton and Kingsford projects for sale in 1948 at prices lower than the purchaser of Parkview Heights was asking in September 1947; (2) changes in economic conditions and outlook, reflecting less optimism and willingness to incur or to finance long-term obligations; and (3) the deterioration of the purchaser’s position in its public relations as a result of the animosity toward it which developed out of the American Legion’s challenge of the transaction.
(b) It is not established by the evidence that the offering of the Walkerton and Kingsford projects for sale by PHA was related in any way to the delay in the closing of the Parkview Heights transaction.
*429 (c) The changes in economic conditions occurred during the delay, but were in no sense caused by it.
(d) The deterioration of the purchaser’s public relations developed during and after the delay, but was not caused by it. Neither was such deterioration caused by the PHA.
EQUIPMENT
44. Schedule A, attached to the General Conditions, contained a legal description of the real estate and the following :
The Parkview Heights projects include all land and buildings, refrigerators * * * now installed in the buildings * * * [and] maintenance and workshop equipment * * *.
Schedule A was submitted to the purchaser as part of the offer form, before the offer form was signed. The General Conditions were dated August 1, 1947.
45. On August 1, 1947, eight refrigerators that had been brought from Walkerton, a nearby PHA project, were at Parkview Heights. One of the refrigerators had been damaged and was set aside at Parkview Heights for storage pending repair. The other seven refrigerators had been installed in Parkview Heights units, and the tenants using them were charged for them. All of the eight refrigerators were carried on PHA records as property of the Walkerton project.
46. Sometime prior to August 7,1947, Arnold S. Levin inquired of a PHA official with whom he was negotiating as to the number of refrigerators at Parkview Heights. The official was not certain, but thought there were 99. Levin suggested specifying the number in the contract. The official declined to do so, because of the additional paper work to be occasioned thereby.
47. On August 7,1947, when the purchaser signed the offer form, there were at Parkview Heights, in addition to the eight refrigerators from Walkerton, a portable saw and a power lawn mower, both of which had at one time been carried by PHA as part of Parkview Heights, but which, on August 7 and thereafter, were recorded as property of the *430 Walkerton project. The change in recording had been made sometime prior to August 1.
48. After August 7, and before August 20, the project manager at Parkview Heights informed the purchaser that the eight refrigerators, the saw, and the mower would be removed and returned to Walkerton. The purchaser objected. Similar advices were given to and objections made by the purchaser in conference on August 20 with the PHA official who accepted the purchaser’s offer on that day.
49. On August 21, 1947, the PHA official who had accepted the purchaser’s offer wrote to the purchaser:
Confirming our conversation of yesterday * * * I pointed out to you that these refrigerators were in excess of the 99 refrigerators * * * and so recognized by you ,* also that the saw and the lawn mower are properties moved from time to time for use in various projects in the vicinity.
You stated that you preferred to accept this explanation of the reason for excluding these items from the sale rather than to have us hold up delivery of our contract of sale until a certified inventory could be included therein. * * *
The paragraph quoted immediately above reflects the substance of the agreement between the purchaser and seller made just prior to the acceptance of the purchaser’s offer by PHA and the delivery to it of the executed contract.
In making such agreement the purchaser intended to waive further claim to the refrigerators, saw, and mower.
50. On August 21,1947, or shortly thereafter, the eight refrigerators, saw, and mower were sent from Parkview Heights to Walkerton by PHA. No further demand for the items was made by the purchaser until the filing of this action.
COUNTERCLAIM
51. The General Conditions contained the following provision:
* * * All rentals from tenants * * * accruing up to the date of settlement shall accrue for the benefit of the Government whether or not collected prior to the date of settlement. All rentals * * * accruing after such date of settlement shall accrue for the benefit of the purchaser.
*431 52. On or before September 30,1947, two tenants of Park-view Heights paid to Knox Homes, Inc., with the knowledge and consent of the project manager for PH A, rentals for the month of October 1947, in the sum of $54.54.
These funds have been retained by Knox Homes, Inc.
Demand therefor has been made by PHA and refused by Knox Homes, Inc.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are entitled to recover. Entry of judgment will be suspended to await the filing of a stipulation by the parties showing the amount due. If no stipulation is presented, the case will be remanded to a commissioner of this court to hold a hearing and make a report as to the amount for which judgment should be entered.

 By the terms of the 1947 Reorganization Plan No. 3, 61 Stat. 964, 12 F. R. 4981, effective July 27, 1947, the various housing agencies ana home loan activities of the Government were consolidated in the Housing and Home Finance Agency, of which the Public Housing Administration was made a constituent. No other names of housing agencies are used in this report, and references are hereinafter made to the Housing and Home Finance Agency as the HHFA and to the Public Housing Administration as the PHA.

 For statutory authority see sections 301 and 304 of the Lanham Act, 42 U. S. C. 1541 and 1644.

 42 U. S. C. 1544.

 A year later members of the veteran-occupants committee stated under oath that the committee had submitted to the March 10 meeting an offer of $175,000 for the property, and had been told that the price was $215,717, cash. The Director of PHA’s Region III, who was present at the March 10 meeting, denied under oath that any offer had been made by the committee, and stated that the requirement of cash had the effect of precluding further negotiation by or with the committee. This conflict of testimony was developed at hearings before the Committee on Expenditures In the Executive Departments of the House of Representatives, April 26-28, 1948. Of. footnote 5 and finding 33.

 “This statement — 1. e., that the property might be purchased upon terms— was contrary to the Information given to the members of the committee. The members of the committee, having abandoned their efforts to purchase because of the firm statement that the price of the property was $215,717 and that the terms were cash, made no application for ‘bid forms’.” From the Eleventh Intermediate Report of the Committee on Expenditures in the Executive Departments submitted to the House of Representatives on May 10, 1948. The conclusions of the House Committee are not cited herein as facts established by the evidence in this case, but as evidence to explain the controversy which later developed between the parties to this action. Of., finding 33.

 Details of the situation were not otherwise developed in the record of this case by evidence or by citation.

 11 E. R. 177A, 915. Policy Order, PHA, Sec. 3550:2, Part IV, Par. 5. Effective, April 18, 1947.

 In keeping with usual Government practice, representatives of defendant regarded this agreement as an understanding that the prospective purchaser would make an offer for the property, which the housing agency would consider. Details of the bargaining, by which the agreed price was arrived at, are not in evidence.

 Moreover, their interpretation of the Indiana law was that they, as nonresidents of the State of Indiana, were not permitted to own or convey real estate in Indiana.

 PHA accepted the offer on August 20. The purchaser had 30 days thereafter within which to examine title and, absent the discovery of defects therein, to mate tender of the balance of the purchase price.

 All four of the Levin brothers are lawyers. Two of them specialize in title work and conveyancing. They and representatives of PHA must be deemed to have been conversant with commercial practice in conveyancing, wherein the closing date of a real estate transaction may, by agreement, be set forward or back for a few days to meet the exigencies of a particular situation.

 Cf., findings 3 to 9, and footnotes 4 and 5. Assertions by members of the veteran-occupants committee that the committee had offered $175,000 for the project, and the action of PHA in negotiating with the Levins pursuant to authority contained in an unpublished regulation, plus the fact that the sale had been made to Knox Homes, Inc., for $150,000, cash, created misunderstanding, doubt, and suspicion in the minds of some occupants, who concluded that their rights as veterans had not been given proper consideration and regard.

 “Pursuant to Rule 38 (e) * •* * it is hereby stipulated * * * that the trial * * * in the first Instance shall be limited to the issues of law and fact relating to the right of plaintiffs to recover.” Stipulation of counsel, filed October 81, 1951. Accordingly, the findings set forth under this heading are concerned with the occurrence but not with the amount of damages.

 Cf., finding 22. The purchaser’s response to the notice of postponement was “* * * we request delivery of deed today or soonest possible. * * *” [Emphasis supplied.]

 One paragraph of the prayer In the Indiana proceeding ashed that the sale be declared null and void. Ordinary business prudence would have required the purchaser, who wanted to reseU the houses, to remove this potential cloud from the title.